Filed 9/13/18; Opinion following transfer from Supreme Court

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re WILLIAM M. PALMER, on Habeas Corpus. | A147177 |

This case returns to us from the California Supreme Court for reconsideration in light of its opinion in *In re Butler* (2018) 4 Cal.5th 728. For the reasons we will explain, we find Palmer entitled to a new parole hearing due to the failure of the Board of Parole Hearings to comply with a statutory mandate to give "great weight" to certain factors related to Palmer having been a minor when he committed his crime, a matter we found unnecessary to address when the case was first before us.

## PROCEDURAL BACKGROUND

In 1988, when he was 17 years old, petitioner William Palmer pled guilty to kidnapping for robbery. Sentenced to life with the possibility of parole, Palmer has appeared before the Board of Parole Hearings (Board) 10 times, without success. At the most recent hearing, on June 2, 2015, the Board denied parole and deferred Palmer's next parole hearing for five years.

Palmer requested reconsideration pursuant to California Code of Regulations, title 15 (Regs.), sections 2028, subdivision (b), 2041, subdivision (h), and 2042, on the grounds the Board had: (1) wrongfully refused to set a base term and an adjusted base term for Palmer's commitment offense, and (2) applied the incorrect standard at Palmer's parole hearing by failing to give "great weight" to the statutory youth offender factors: "the diminished culpability of youth as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual." (Pen.

1

Code, §§ 3051, subd. (f)(1), 4801, subd. (c).)[1]  In connection with both arguments, Palmer maintained that the Board did not (and cannot) identify substantial countervailing evidence outweighing the three youth offender factors or showing him to be currently dangerous.

The Board denied Palmer's request for reconsideration in a letter stating that appropriate weight had been given to the youth offender factors at his hearing and that a separate letter would respond to the base term issue.  No separate letter was forthcoming.

On December 31, 2015, Palmer filed an original petition in this court based on the stipulation and order regarding settlement filed in *In re Butler* (2015) 236 Cal.App.4th 1222, 1234, which required the Board to adopt and implement procedures for setting life prisoners' base and adjusted base terms at the initial parole hearing (or, if that hearing had already taken place, the next one), and provided that this court "shall retain jurisdiction of this case until the amended regulations, conforming to the base term setting practices as described in this order, become effective."  In an informal response, the Attorney General argued that the *Butler* settlement did not apply to Palmer because he was a youth offender, and that the Board's decision to deny parole comported with the requirements of the youth offender statute.

We issued an order to show cause.  Six days later, the Board calculated Palmer's base and adjusted base terms.  After receiving the parties' return and traverse and holding oral argument, we issued our opinion on July 26, 2017, holding that the June 2, 2015, hearing did not comport with the settlement and stipulated order of our court in *Butler*, and ordering the Board to conduct a new hearing within 120 days in light of the terms it had set for Palmer.

The Board set a hearing date of October 26, 2017, which it then postponed to November 17.  On November 15, 2017, the California Supreme Court granted the Board's petition for review of our ruling, deferred further action on the matter pending consideration of a related issue in the Board's appeal from our order denying its motion

---

[1] All statutory references are to the Penal Code.

2

to modify the settlement and stipulated order in *Butler*. The court also denied as moot Palmer's motion to compel the Board to hold a parole hearing on October 26, 2017, and stayed our order requiring the Board to conduct a parole hearing for Palmer.

On April 2, 2018, the Supreme Court issued its decision in *In re Butler, supra,* 4 Cal.5th 728. Finding that sufficiently material postsettlement changes to section 3041 required modification of the *Butler* settlement agreement, the court reversed our judgment and ordered the settlement modified to relieve the Board of its obligations to calculate base terms and adjusted base terms. (*Butler*, at pp. 747-748.)

On June 27, 2018, the Supreme Court remanded the present appeal to our court with directions to vacate our decision and reconsider the cause in light of its decision in *In re Butler, supra,* 4 Cal.5th 728. Palmer then filed a supplemental brief acknowledging that the Supreme Court's decision in *Butler* required us to revise our decision in this case but contending that he remained entitled to relief due to the Board's failure to afford "great weight" to the youth offender factors, the alternative ground for his petition. The majority of our court had felt it unnecessary to reach the alternative claim because it agreed with Palmer's contention that the Board violated the *Butler* settlement. Considering that the ground upon which we initially granted Palmer's petition has now been rejected by the Supreme Court, and that the alternate claim was fully briefed by the parties but not decided by us, we deem it appropriate to now address Palmer's claim that the Board failed to give "great weight" to the youth offender factors at his hearing.

## FACTUAL BACKGROUND

Palmer was raised primarily by his mother, with only sporadic contact with his father. At some point, his family moved from a low income area to one with "predominantly wealthier kids"; Palmer related that his self-esteem suffered and he committed crimes and used drugs in order to be accepted by his peers, "have the things that they had" and "do the things they were doing." He admitted his first offense, driving without a license, in July 1985. In February 1986, he admitted a violation of Penal Code

3

section 288a, a felony, for his conduct with three minors.[2] He was placed on probation, which he then violated with two charges of robbery, burglary, and attempted burglary.

Palmer committed his life offense in 1988. His face covered with a ski mask, Palmer lay in wait in a parking garage in an apartment complex with which he was familiar (having previously committed burglaries there). He had taken a bus to this location because he "knew rich people lived there" Brandishing an unloaded .357 revolver he had stolen in a previous burglary, Palmer confronted Randy Compton, and ordered him to turn over his wallet. Compton said he did not have one, and Palmer "spur of the moment" decided to ask if he had a bank card; Compton said he did, and Palmer ordered him to drive to an ATM and withdraw $200. When they arrived at the bank, Compton, an off-duty police officer, drew his gun and fired 15 rounds at Palmer, who was hit in the knee and fled. Palmer was captured shortly thereafter, waived his *Miranda* rights, and confessed to the crime in an account fully corroborated by Compton.

During his 30 years in prison, Palmer, a high school dropout, obtained a General Education Diploma (GED) and, in 2007 an Associate of Arts Degree from Palo Verde College. The deputy commissioner at the 2015 hearing commented that Palmer had done a "really good job" with his educational upgrade. Palmer learned to paint in prison, joined "Arts in Corrections," and has become an accomplished artist: He has sold some of his art work and has painted three murals on the prison grounds. one of which the deputy commissioner described as "very beautiful," and another of which the presiding commissioner described as "very good work."

With regard to self-help, Palmer was described as "working steadily," his volume of progress "just fine." He has participated in a range of self-help programs, including substance abuse and victims' impact programs included in the "Long-Term Offender Pilot Program"; courses on conflict resolution and anger management; faith-based self-improvement programs; Narcotics Anonymous (NA); and the "Criminal Gangs and

---

[2] Though he pled guilty to the section 288a allegation, Palmer insisted at the hearing he was not guilty of the crime.

4

Violence Prevention Program." Palmer has also contributed to the prison community, including tutoring other youth offenders, volunteering as an inmate peer health educator, and participating in the "Visiting Beautification Project."

Palmer's parole plans were discussed at length at the 2015 hearing and deemed satisfactory. His ultimate plan was to move to Washington State to be with the family of his girlfriend, Alicia Newbill. The Board received many letters of support for Palmer, including letters from his sister, his cousin, his uncle; a person who volunteered to be his Alcoholic Anonymous (AA) sponsor, several people who had known him since elementary school, Newbill and her father and brother. Newbill's father, who had met Palmer in prison, spoke highly of Palmer's character, as did her brother, a painting contractor who said he was willing to offer Palmer a job.

At the parole hearing preceding the one now before us, on April 11, 2013, the Board denied parole primarily because of Palmer's disciplinary violations in prison, which were described as reflecting "serious misconduct while incarcerated." The denial was for five years, but Palmer was successful in having that time advanced. At the present hearing on June 2, 2015, Palmer acknowledged that while he was not happy about the five-year denial in 2013, he "deserved it" because he had "two 115s" and "knew that [he] still had some work to do." He agreed with the deputy commissioner's assessment that the 2013 panel "kind of nailed it" in seeing an "ongoing pattern" of Palmer minimizing his prior criminality and failing to remain free of disciplinary violations, and having not "internalized any of the concepts of self-help." Palmer acknowledged that he did not see this in 2013, and saw the Board as an adversary. He explained that it was only recently, with the help of Newbill, that he came to realize "[w]e [are] on the same team. We want to make sure that the public is safe from me, from my decision making."

Palmer described May 7, 2014, the day he incurred his most recent disciplinary violation, as a turning point. The violation was for giving Newbill, at a visit, the T-shirt he wore when he painted. Palmer told the panel that previously he had been unwilling to "really look deep inside myself" to "figure out what the causative factors" were; he was "selfish and inconsiderate and reckless and breaking the rules," refused to accept blame

5

for robbing or hurting people and instead blaming everyone else.  After May 7, Palmer said, his eyes were opened by "Alicia's crying and telling me what I did that day."  He went to NA and "[w]e were talking about resentment and anger, and it was just a breakthrough right there.  It was finally just like I have no reason to resent anybody in my life.  Everybody has a reason to resent me.  I've done all of this."

Since May 7th, 2014, Palmer said, "I've changed who I was and how I thought and how I behave."  Through talks with Newbill, meetings with a psychologist and "begg[ing] my groups and them to really get me to understand," he "started to really understand that it was about having integrity all the way every day through everything that I do.  And that's what really hit home.  And once I started practicing that mentality, that state of mind, everything changed.  I mean, literally, the staff, the way they treated me changed.  The way other inmates approached me and dealt with me.  And I don't think her father would've came down here to visit and then left and came back if I didn't make those changes.  And I see it today in myself.  To really be able to say why it took so long, I wish it took sooner.  Trust me.  I would've loved to have made these changes sooner, but it came when it came."

Palmer told the panel:  "There is absolutely no excuse for breaking the rules. . . .  I was making terrible decisions, and I wasn't capable of making rational decisions because I was undermining my punishment each and every time I decided to act on my impulses."  After "living in denial for 26 years," he said, "since May 7th, I made a commitment.  I made a physical change, a mental change, and a spiritual change."  He explained that Newbill had pointed out his "hypocrisy" in ways that "hit home hard," including asking him, "How are you being a Muslim and being deceptive?"  Palmer told the Board that although "those are the reasons why I made the change," Newbill was not the reason he would "stay changed."  "I invented an ego, a mindset when I was nine years old.  And he came in to protect me, to give me what I wanted, to do whatever I needed him to do.  And that was me, but today I've been able to shrink him down.  I've been able to manage my own life now.  I've been able to make my own decisions."

6

Reports by two licensed psychologists were before the panel.  In a December 2014 psychological evaluation, Dr. Paul Good referred to Palmer's work in the "Man Up" program having had an effect on the "self-defeating behavior that he had previously brought into contact with prison authorities."  Asked what self-defeating behavior Dr. Good was referring to, Palmer answered that he was "stuck in my denial," "making decisions for selfish reasons and gangs, working off my impulses and emotional responses," and "until I really started to understand what it is to be a man, to have integrity, to be honest, to be forthcoming, to be accountable and responsible, I was stuck in my prison mentality."

Dr. Good's report concluded that Palmer was a "good candidate for parole," having "matured and mellowed over 27 years of imprisonment."  According to Dr. Good, Palmer's "remorse is genuine and much of his impulsivity has been replaced by a thoughtfulness."  His "advancing years" lowered the likelihood of him reoffending, and his recent rules violations were "modest transgressions."  Good concluded Palmer risk for future violence was "low."

The October 2014 "Comprehensive Risk Assessment" performed by Dr. Geca concluded Palmer's risk for violence was "moderate," although her report noted that there was no documentation Palmer had been violent since 1990, he had "gained greater self-control over his aggressive and violent behaviors" and his "missteps are not major and they do not warrant a significant elevation of his risk."  Dr. Geca noted that although Palmer had begun to take "a more candid look at his antisocial and criminal attitudes and behaviors," because "the depth of his exploration has only developed in *the most recent months*," his increasing age had "only modestly mitigate his risk thus far and a more concerted and consistent effort is needed on his part to solidify his positive changes."  The presiding commissioner quoted Dr. Geca's report:  " 'The undersigned has seriously considered a low risk for Mr. Palmer given his developing insight in the errors.  However, despite having provided with repeated feedback by the Panel and mental health doctors, he continued to engage in institutional misconduct.  In fact, he's incurred three additional Rule Violations since the last time he was evaluated by this undersigned . . .

7

and the last one was 2014. . . . Failure to curb these behaviors, unfortunately, has necessitated a slight increase of your previous level of risk from a low-moderate to a moderate.' "

The Board found Palmer posed an unreasonable risk of danger and therefore was ineligible for parole. The presiding commissioner stated that this conclusion was reached "after giving great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and maturity," and observed that the record reflected "some circumstances tending to show suitability in that he committed his crime as a juvenile, 17 years of age." The commissioner stated that the panel had assumed Palmer's culpability was diminished as compared to that of adults and considered his background, lack of maturity, "underdeveloped sense of responsibility," failure to "weigh the long-term consequences of his actions" and impulsivity, and evaluated whether Palmer had shown growth and positive rehabilitation. The commissioner further noted that Palmer was "at an age that would reduce the probability of recidivism" and had "realistic plans for release."

The panel found, however, that these circumstances were "far outweighed by other circumstances tending to show unsuitability and suggest if released Mr. Palmer would pose a potential threat to public safety." After discussing the commitment offense, the presiding commissioner told Palmer that he had made "a mistake in life" and then "multiplied that mistake 27 times," failing to "learn from the errors of your ways," take advantage of opportunities for rehabilitation or address the "consequences of your action as an adult." The commissioner emphasized Palmer's failure to remain free from discipline, with 115s showing a "consistently obvious pattern" of denying responsibility for his actions, and said Palmer's "inability to follow the rules and regulations of this institution or whatever institution you might be at . . . shows who you are as a person at the time." Telling Palmer, "your actions will speak louder than your words," the commissioner noted that it was rare for a comprehensive risk assessment to increase, as Palmer's had, and that Palmer would need to be honest with himself and, as Dr. Geca's report stated, " 'demonstrate consistently improving behaviors in these critical areas for a

8

protracted time in order to be able to lower your current determined risk.' " The deputy commissioner added, among other things, that according to Palmer's own testimony he was "the same person in 2014 as [he was] in 1988," and while his rule violations were not violent, Palmer "had a very sophisticated criminal mentality over a number of years" in prison, as reflected in his having and finding a way to pay for a cell phone that he used to avoid the prison's monitoring of his communications.

As earlier indicated, Palmer has argued throughout these proceedings that the 2015 denial of parole was not supported by any evidence that he currently presented a public safety risk. In our original opinion, although it was unnecessary to resolve Palmer's argument that the denial of parole should be set aside on this basis, we commented upon the evidence in order to provide "guidance to the parties on remand." Those comments remain relevant.

After describing the "extremely deferential" "some evidence" standard of review set forth in *In re Shaputis* (2011) 53 Cal.4th 192, 214, we first discussed the Board's reliance upon Dr. Geca's elevation of Palmer's risk for future violence from the "low/moderate" level she had found after evaluating him in 2010 to "moderate" in her 2014 report. We stated, "As the presiding commissioner noted, this is unusual, and it is not clear what it is that transpired between Dr. Geca's 2010 and 2014 reports that caused her to elevate her risk assessment. Nevertheless, Dr. Geca said what she said, and recited some of the things on which she relied, describing Palmer's issues, some of which he had yet to adequately address. Thus, for example, Dr. Geca stated 'he [has] yet to understand . . . how pervasive his egocentric worldview is and to what extent it impacts his attributions, interpretations and his behaviors." She also noted that Palmer could not provide a reasonable explanation of how he intended to manage his impulsivity in the future. And 'given his track record while in a controlled environment, it could not be reasonably concluded that he would obey all laws in a less restrictive setting.' We would have to conclude this was 'some evidence.'

"Moreover, the commissioner indicated in essence that Palmer admitted some maladaptive behavior. That is, until May 7, 2014, he recognized that he was ' "still

9

holding onto [his] criminal thinking" ' and feeling entitled to 'engage in certain behaviors and not be held accountable,' recognizing that he was ' "addicted to an instant gratification." ' Indeed, Palmer admitted that he was the same person in 2014 as he was in 1988."

With respect to the presiding commissioner's description of Palmer as " 'consistently on an ongoing basis receiv[ing] disciplinary actions for a variety of issues,' " we observed that of the only two incidents referred to, one occurred in 2012—when Palmer was cited for possession of a cell phone, which he immediately admitted was his and claimed he used to speak with his family after his mother died—and "was not recent, but before the 2013 hearing." The only recent rule violation, for misuse of handicraft, was for Palmer's attempt to give Newbill his T-shirt when she visited him on May 7, 2014. According to Palmer, he intended a gift of appreciation for her traveling from Washington state to attend his graduation ceremony. We observed, "Giving a shirt to a girlfriend is, of course, relatively innocuous, but Palmer's prevarications before finally taking responsibility for his actions concerned the Board. That is, Palmer initially denied responsibility for the May 7 violation, and provided contradictory explanations. He first asserted there was 'no evidence to prove' he had given Newbill the shirt, and then, in the words of the presiding commissioner, 'threw her under the bus' by alleging she could have brought the present into the prison or someone else in visiting could have given her the shirt—this despite Palmer being the only prisoner she was authorized to visit. Only later did Palmer admit the truth.

"While serious misconduct in prison or actions amounting to criminal misconduct are proper parole criteria, it must be 'reliably documented' and there must be a nexus between the rule violation and current dangerousness. (Cal. Code Regs., tit. 15, § 2281, subd. (b) [information considered includes 'involvement in other criminal misconduct which is reliably documented' and section (c)(6) states serious misconduct in prison is an unsuitability criteria].) In short, the rule violation must still demonstrate a nexus to present dangerousness. (See, e.g., *In re Moses* (2010) 182 Cal.App.4th 1279, 1309–1310.) Any such nexus here is hard to discern.

10

"Thus, we are left with Dr. Geca's report and Palmer's own description of his state up to May 7, 2014 as the evidence supporting the Board's denial of parole. Applying the ultralenient standard as we must, we would conclude that it is some evidence—but barely. It is an extremely close case."

Noting that Palmer's next parole hearing would be sometime in late 2017, some two and one-half years after his last hearing,[3] we "assume[d] that if Palmer's prison record in those 30 months has been uneventful, the Board could not conclude that there is some evidence of current dangerousness. Put otherwise, if Palmer has kept his promise to the system and to himself, not even Dr. Geca could conclude Palmer is anything but a low risk for violence."

## DISCUSSION

Palmer's claim is based on the 2013 enactment of Senate Bill No. 260, which added provisions to the Penal Code relating to parole hearings for "youth offenders" who were 18 years of age or younger at the time of their controlling offense (i.e., that for which the longest period of imprisonment was imposed). (Stats. 2013, ch. 312, §§ 3046, subd. (c), 3051, 4801, subd. (c).) Later amendments raised the age of a "youth offender" first to 23 years of age or less and then to 25 years of age or less. (Stats. 2015, ch. 471, § 1; Stats. 2017, ch. 674, §§ 1, 2.)

Section 4801 provides that the Board "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).) Similarly, section 3051 provides that any psychological evaluations and risk assessment instruments used by the Board "shall take into consideration the diminished culpability of youth as compared to adults, the hallmark

---

[3] We did not anticipate at the time of our opinion that Palmer's next parole hearing would not take place in late 2017. It is now more than three years since the parole hearing.

11

features of youth, and any subsequent growth and increased maturity of the individual."
(§ 3051, subd. (f)(1).)

As our Supreme Court noted in *People v. Franklin* (2016) 63 Cal.4th 261, 277
(*Franklin*), the Legislature passed Senate Bill No. 260 for the explicit purpose of bringing
the parole process into conformity with the opinions of the United States Supreme Court
in *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*) and *Graham v. Florida* (2010) 560
U.S. 48 (*Graham*) and the consonant opinion of the California Supreme Court in *People
v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*).  Accordingly, these opinions, which
apply the " 'foundational principle' " that, under the Eighth Amendment prohibition
against cruel and unusual punishment, "the 'imposition of a State's most severe penalties
on juvenile offenders cannot proceed as though they were not children' " (*Franklin,* at
p. 273, quoting *Miller,* at p. 474), necessarily inform the meaning of the youth offender
statutes.[4]

Drawing on the court's prior opinions in *Graham* and *Roper*, *Miller* explained
why children are constitutionally different from adults for sentencing purposes:  "First,
children have a ' "lack of maturity and an underdeveloped sense of responsibility" '
leading to recklessness, impulsivity, and heedless risk-taking.  [Citation.]  Second,
children 'are more vulnerable . . . to negative influences and outside pressures,' including
from their family and peers, they have limited 'contro[l] over their own environment' and
lack the ability to extricate themselves from horrific crime-producing settings.  [Citation.]
And third, a child's character is not as 'well formed' as an adult's; his traits are 'less

---

[4] These cases hold that the Eighth Amendment prohibits a sentence of life without
parole for a juvenile who commits a nonhomicide offense (*Graham, supra,* 560 U.S. at
p. 74); a mandatory sentence of life without parole for a juvenile who commits a
homicide offense (*Miller, supra,* 567 U.S. at p. 465); and a term-of-years sentence so
long that it amounts to the "functional equivalent" of a sentence of life without parole for
a juvenile who commits a nonhomicide offense (*Caballero, supra,* 60 Cal.4th at p. 268
[110-year sentence]).  The United States Supreme Court had previously held the Eighth
Amendment forbids imposition of the death penalty on offenders who were under the age
of 18 when they committed their crimes.  (*Roper v. Simmons* (2005) 543 U.S. 551, 578-
579 (*Roper*).)

fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " (*Miller, supra*, 567 U.S. at p. 471; accord, *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1388-1389.)

*Miller* further explained that "[o]ur decisions rested not only on common sense— on what 'any parent knows'—but on science and social science as well. [Citation.] In *Roper*, we cited studies showing that ' "[o]nly a relatively small proportion of adolescents" ' who engage in illegal activity ' "develop entrenched patterns of problem behavior." [Citations.] And in *Graham*, we noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' [Citation.] We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his ' "deficiencies will be reformed." ' " (*Miller*, *supra*, 567 U.S. at pp. 471-472.)

As *Miller* said, *Roper* and *Graham* "emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because ' "[t]he heart of the retribution rational" ' relates to an offender's blameworthiness, ' "the case for retribution is not as strong with a minor as with an adult." [Citations.] Nor can deterrence do the work in this context, because ' "the same characteristics that render juveniles less culpable than adults" '—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment." (*Miller*, *supra*, 567 U.S. at pp. 472-473.) Accordingly, as our Supreme Court recently observed, *Roper* and its progeny show that "[s]ome punishment is cruel and unusual as it pertains to juvenile offenders, even though the same sanction may not run afoul of the Eighth Amendment when applied to adults." (*In re Kirchner* (2017) 2 Cal.5th 1040, 1046.)

The present case differs from *Miller*, *Graham*, and *Roper* because, unlike the juveniles in those cases, Palmer was not convicted of a homicide, was not sentenced to life without the possibility of parole, does not claim his sentence is the functional

equivalent of life without parole, and does not challenge the life sentence he received. The relevance of those cases is their recognition of the significance of the diminished culpability of youth offenders to the proportionality of punishment, which is a constitutional principle based on individual culpability. As stated in *Graham*, " '[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.' " (*Graham, supra*, 560 U.S. at p. 71.) The youth offender statutes do not mean that a juvenile offender may not be sentenced to a life term as an adult who committed the same offense would be, but they do mean that such punishment cannot be imposed on a juvenile without giving "great weight" to the factors that account for the diminished culpability of youth offenders and, therefore, might point to the constitutional disproportionality of the punishment. By enacting the youth offender statutes, which are not crime specific, the Legislature mandated that, for the reasons described in *Miller*, *Graham*, *Roper*, and *Caballero*, youth offenders sentenced to indeterminate life terms and eligible for parole, or to substantial determinate terms, must *all* be treated differently from other life prisoners. (§ 3051, subd. (b)(1).)

The requirement that the Board give "great weight" to the three youth offender factors—"the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and maturity of the prisoner—diminishes the Board's discretion to determine the bases upon which suitability or unsuitability for release may be determined. At an adult offender hearing the "manner in which the specified factors relevant to suitability are considered and balanced lies within the discretion of the [Board]. " (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677.) At a youth offender hearing, however, the Board is statutorily required to give "great weight" to the specified factors that favor finding suitability for parole. Not only does this requirement impose a constraint upon the Board's discretion, it requires some revision of the Board's approach to the suitability determination, because some of the regulatory factors generally used by the Board as tending to show unsuitability for release are discordant with the thesis of the youth offender statutes. For example, the facts that the prisoner "demonstrated serious assaultive behavior at an early age" (Regs., § 2281, subd. (c)(2))

14

or "has a history of unstable or tumultuous relationships with others" (Regs., § 2281, subd. (3)), or that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense"[5] (Regs., § 2281, subd. (c)(1)(E)), are described in the regulations as tending to show unsuitability, but under the reasoning of the *Miller* line of cases would be factors tending to reduce culpability.

***The Meaning of the "Great Weight" Provision of the Youth Offender Statutes***

Although no court has yet defined what "great weight" signifies at a youth offender hearing, the California Supreme Court has addressed the meaning of that phrase in other contexts. The most pertinent is *People v. Martin* (1986) 42 Cal.3d 437 (*Martin*), which reversed a divided opinion of our court. The defendant in that case, who was convicted of seven robberies, was sentenced to five years' imprisonment for the principal robbery, a one-year enhancement for the use of a knife, and six consecutive one-year terms for the remaining robberies, for a total of 12 years. At that time, the parole board (then called the Board of Prison Terms) was required by former section 1170, subdivision (f), to conduct sentencing review to assure uniformity in sentencing and notify a

---

[5] As one commentator has pointed out, the reasoning that a history of being abused and living in a criminogenic environment as a child are factors tending to favor denying parole, "is that research on adult offenders shows a correlation between these factors and violent conduct. The Board treats these factors as evidence to predict that a person is more likely to commit future violence, and thus less suitable for parole. In contrast, the law flowing from *Miller* is clear that a history of abuse, a criminogenic environment, and negative peer influence are mitigating factors in considering culpability and the appropriate sentence for a juvenile. Although the sentencing context is different from the parole context . . . , it would be unfair to consider evidence of a horrific childhood as a reason to deny parole. For a person can do nothing to change his childhood history; it would be non sequitur to say that a person with a horrific childhood has, in virtue of that childhood, failed to demonstrate rehabilitation as an adult." (Bell, *A Stone of Hope: Legal and Empirical Analysis of Juvenile Lifer Parole Decisions* (2018) vol. 13, No. 46, Corrections & Sentencing L. & Policy eJournal, p. 75 <https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3228681> [as of Sept. 13, 2018].) Nevertheless, an empirical study conducted by this commentator of 426 parole decisions among juvenile lifers in California found that "[a] history of abuse, trauma, or other instability in childhood was cited as a reason supporting the denial of parole in fifty-nine percent of the Board's decisions to deny parole." (*Id*. at p. 76.)

sentencing court if it considered a given sentence disparate. The parole board notified the trial court that the defendant could not legally be sentenced to more than 11 years' imprisonment, that an 11-year sentence would be disparate and that the sentence should fall into a range of 5 to 10 years. The trial court granted the parole board's motion for resentencing only with respect to the legal error, but otherwise refused to modify the sentence. We affirmed the ruling in a split decision. The Supreme Court reversed.

The *Martin* majority held that in determining whether the sentence was in fact disparate, as found by the Board, "the determination of the board is entitled to 'great weight.' " (*Martin, supra*, 42 Cal.3d at p. 446, quoting *People v. Herrera* (1982) 127 Cal.App.3d 590, 600-601.) The *Martin* court, however, rejected the view that a " 'a trial court will have met its obligation of according the Board's finding of disparity "great weight" . . . if the record shows that the court seriously considered the information provided by the Board, and attempted to discern whether, when compared to sentences imposed by his colleagues, the sentence he imposed . . . was "disparate." ' " (*Martin,* at p. 446, quoting *Herrera,* at p. 601.)

Instead, *Martin* endorsed the definition of "great weight" it had utilized in two cases involving trial courts' review of the Youth Authority's recommendations that a juvenile convicted of crime be committed to the Youth Authority rather than state prison: The recommendation "was entitled to 'great weight' " and "must be followed in the absence of 'substantial evidence of countervailing considerations of sufficient weight to overcome the recommendation." (*Martin, supra*, 42 Cal.3d at p. 447, quoting *People v. Carl B.* (1979) 24 Cal.3d 212, 214-215, and *People v Javier A.* (1985) 38 Cal.3d 811, 819 (*Javier A.*).) In the context of sentence disparity, *Martin* said, the court had to accept the Board's finding "unless there is substantial evidence of countervailing considerations which justify a disparate sentence. Such considerations can include subjective factors . . . such as defendant's attitude and demeanor at the time of the crime, and the manner in which he threatened the victim." (*Martin,* at p. 448.) But "[r]equiring the trial judge merely to 'consider' the finding of disparity . . . gives no weight at all to that finding.

16

The judge would remain free to disregard the finding for any reason, or no reason at all." (*Ibid.*)

Applied to the present context, *Martin* directs that in order to give "great weight" to the youth offender factors as required under section 4801, subdivision (c), the Board must accept those factors as indicating suitability for release on parole absent substantial evidence of countervailing considerations indicating unsuitability.

In its return to the order to show cause, the Board "denies [that] this court should define 'great weight' pursuant to [*Martin, supra,*] 42 Cal.3d 437 or any of the nonbinding cases Palmer cites [i.e., *People v. Carl B. supra*, 24 Cal.3d 212 and *Javier A., supra*, 38 Cal.3d 811]," because "[t]here is no rational reason to evaluate the Board giving great weight to youthful factors the same as when deciding if the trial court properly rejected the Youth Authority's recommendation to house an inmate there rather than in adult prison," as in *Javier A.* The Board emphasizes that in *Javier A.*, "the tension was between the YA's recommendation and the trial court's opinion," whereas "[h]ere, the Board is the sole decisionmaker that considers and weighs the relevant factors under the current law. Thus the processes underlying [this case and *Javier A.*] are neither analogous nor comparable."

The Board also finds *Martin* factually distinguishable because the reason for requiring that great weight be accorded to the Board's finding of disparity was that the Board had conducted an extensive statistical and subjective review while "the trial court 'may have little or no experience in comparative review of sentences.' " The Board suggests that because it possesses the expertise to determine whether a prisoner is suitable for release, "*Martin* supports the analogy that the reviewing court must give great weight to the Board's finding of unsuitability—not that the Board must give excessive weight to certain statutory factors."

Finally, the Board maintains that it "gave great weight to Palmer's youth factors when determining his suitability, and referenced this obligation no fewer than 10 times." As the Board sees it, Palmer misconstrues the youth offender statutes "as requiring the Board to categorically find any juvenile offender suitable for parole simply based on his

17

age when he committed the life crime. Palmer errs because considering the youth factors does not diminish the Board's discretion to deny parole when the record demonstrates that the inmate would pose a current, unreasonable risk to public safety."

The Board's contentions fail to address the meaning of the statutory phrase "great weight," and treat the youth offender factors as no more significant than the regulatory and other factors it conventionally relies upon to determine whether a life prisoner is suitable for release. The Board's argument that it "is the sole decisionmaker that considers and weighs the relevant factors under the current law" ignores the fact that the direction to not only consider but accord "great weight" to the youth factors comes from the Legislature. The Legislature "is thus accorded the broadest discretion possible in enacting penal statutes and in specifying punishment for crime." (*In re Lynch* (1972) 8 Cal.3d 410, 414.) "The efficacy of any sentencing system cannot be assessed absent agreement on the purposes and objectives of the penal system. And the responsibility for making these fundamental choices and implementing them lies with the legislature." (*Harmelin v. Michigan* (1991) 501 U.S. 957, 998-999; accord, *Solem v. Helm* (1983) 463 U.S. 277, 290 ["[r]eviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining types and limits of punishments for crimes"].) Here, while otherwise leaving it to the Board to enumerate and determine the relative importance of factors bearing on suitability for parole, the Legislature has singled out the youth factors in a rare, express directive as to the Board's exercise of discretion.[6]

---

[6] We are aware of only two other instances in which the Legislature has specifically directed the Board to consider a particular factor as bearing on suitability for release: The Board must "give great weight to any information or evidence that, at the time of the commission of the crime, the prisoner had experienced intimate partner battering, but was convicted of an offense that occurred prior to August 29, 1996" (§ 4801, subd. (b)(1)) and, under the Elderly Parole Program, it must "give special consideration to whether age, time served, and diminished physical condition, if any, have reduced the elderly inmate's risk for future violence." (§ 3055, subd. (c).)

18

Untenably, the Board treats the youth offender statutes as merely an exhortation for leniency, placing no limitation on the Board's unfettered discretion to decide whether a youthful offender remains an unreasonable risk of danger to society if released from prison and requiring only that the prisoner's status as a youth offender be acknowledged for the record and taken into account in some undefined fashion. Except for the repetition of that acknowledgment, the transcript of the "youth offender hearing" conducted in the present case is not materially different from those of the parole hearings conducted by the Board for adult offenders. The Board's published statistics reflect comparatively few youth offenders being granted parole,[7] at rates very similar to those for adult offenders,

---

[7] According to the Board's most recent "Report of Significant Events," of 2,586 youth offender hearings scheduled by the Board in 2017, 458 resulted in parole being granted—17.7 percent. (Board of Parole Hearings, *2017 Report of Significant Events* (May 14, 2018) p. 1 (*Significant Events*).) This rate is not much different than the rate for adults during the same period: Parole was granted in 457 of the 2,748 adult offender cases scheduled for hearing—16.6 percent. Looked at conversely, 1,033 youth offenders were denied parole (about 40 percent), while 1,184 adult offenders were denied (43 percent).

Of the inmates for whom parole hearings were scheduled, 450 stipulated to unsuitability, 8.8 percent of the youth offenders and 8 percent of the adult offenders. Hearings were waived, postponed, continued or cancelled for 33.5 percent of the youth offenders and 32 percent of the adults. (*Significant Events*, *supra,* at pp. 1, 6.)

The relatively large number of inmates who gave up their right to a hearing has been described as reflecting a disincentive built into the Board's parole process: "If an inmate anticipates a high probability of denial of parole at a hearing, s/he often chooses to cancel the hearing as a formal denial by the Board could greatly delay his or her entitlement to a subsequent hearing. The mechanism[] by which an inmate exercises this risk aversion is a stipulation to his/her own unsuitability for parole release; a waiver of the hearing; or a postponement. A stipulation is essentially the inmate's concession that s/he is not suitable for parole release, while a waiver is a related but slightly different mechanism by which the inmate agrees to forego his/her entitlement to a hearing at which s/he could have argued suitability. The use of these procedural mechanisms has become much more significant since the passage of Marsy's Law in 2008, which greatly increases the delay in entitlement to a new hearing after a denial[,] and regulations promulgated in 2008 that give an inmate the right to waive his or her hearing without stipulating to unsuitability." (Weisberg et al., Stanford Criminal Justice Center, *Life in Limbo: An*

which raises some question whether "great weight" is being given to the statutory youth offender factors.  And a recent empirical study suggests that the "great weight" mandate is not functioning to focus the Board on the youth offender factors, while variables that do not appear related to growth and maturity have a strong impact.[8]

The chief flaw in the Board's view of the youth offender factors is the Board's failure to appreciate that they serve a legislative purpose very different from that of the regulatory and other factors the Board conventionally employs to determine whether a prisoner is suitable for release.  The regulatory factors tending to show suitability and unsuitability for release (Regs., §§ 2281, subd. (c)(d), 2402, subd. (c)(d)), and the non-

---

*Examination of Parole Release for Prisoners Serving Life Sentences with the Possibility of Parole in California* (Sept. 2011) p. 11.)

[8] According to the author of a lengthy empirical analysis of 426 decisions by the Board in recent youth offender parole proceedings, none of the variables pertaining to a parole candidate's youth have a statistically significant impact on either the risk assessment score or the parole hearing result.  Independent variables, however, "exert a very strong impact on the parole decision.  The odds of being granted parole are 33 times less if the district attorney opposes, and six times less if the victim opposes.  Being a black parole candidate, being before the parole board for the first time, and being incarcerated in a maximum security prison each reduces the odds of parole and increases the likelihood of a higher risk score.  Further, being convicted of a sexual offense, having served more time than the norm for the conviction and not retaining a private attorney have a significant and substantial impact on reducing the odds of parole.  None of these variables appear to measure growth or maturity, and their combined impact can match or outweigh the impact of variables that look to adult conduct and offer some measure of growth and maturity."  (Bell, *A Stone of Hope:  Legal and Empirical Analysis of Juvenile Lifer Parole Decisions, supra,* vol. 13, No. 46, Corrections & Sentencing L. & Policy eJournal, pp. 60-61 <https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3228681> [as of Sept. 13, 2018].)  These findings concerning the effect of extraneous variables appear to be consistent with those of an earlier empirical analysis of the length of deferral periods ordered after a denial of parole, which found that "extralegal" factors such as whether an inmate was represented by private or appointed counsel and identity of the commissioner "seem to have a significant impact on the length of deferral periods received by similar inmates" while certain factors "clearly relevant to the proper length of deferral period, most notably parole readiness, seem to have little effect on the deferral decision."  (Friedman & Robinson, *Rebutting the Presumption:  An Empirical Analysis of Parole Deferrals Under Marsy's Law,* 66 Stan. L.Rev 173, 25.)

regulatory factors that may also be used for that purpose (such as "insight" into the commitment offense or the lack thereof (see *In re Shaputis, supra,* 53 Cal.4th at pp. 218-219), include circumstances predating, relating to and postdating the life crime, but because the critical question is whether the inmate *currently* presents a risk to public safety, the focus is largely on postconviction circumstances.[9]  Two of the three youth factors, however—the "diminished culpability of youth offenders compared to that of adults" and "the hallmark features of youth"—look backward to the time when the life crime was committed and thus specifically relate to the constitutional principle of proportionality.  The necessary inquiry in proportionality analysis is into "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society," (*In re Lynch, supra*, 8 Cal.3d at p. 425) as the punishment must fit both the offense and the offender, with both viewed "in the concrete rather than the abstract." (*People v. Dillon* (1983) 34 Cal.3d 441, 479.)

Age is one of the variables recognized as bearing on whether punishment is proportional to an offender's individual culpability.  (*People v. Dillon, supra,* 34 Cal.3d at p. 479.)  Moreover, one of the virtues of age as a measure of proportionality is its objectivity.  As pointed out by Justice Kennedy in *Harmelin,* proportionality review should be informed by " 'objective factors to the maximum possible extent.' " (*Harmelin v. Michigan, supra,* 501 U.S. at p. 1000 (plurality opn.), quoting *Rummel v. Estelle* (1980) 445 U.S. 263, 274-275.)  Age is among the Board's regulatory factors tending to show suitability for release, but only inasmuch as "the prisoner's *present* age reduces the probability of recidivism" (Regs., §§ 2281, subd. (d)(7), 2402, subd. (d)(7), italics added); the Board's regulations relating to suitability do not consider a prisoner's age *at*

---

[9] Thus, the gravity of the commitment offense; i.e, whether the prisoner "committed the offense in an especially heinous, atrocious or cruel manner" (Regs., §§ 2281, subd. (c)(1), 2402, subd. (c)(1)), a factor tending to show unsuitability for release, may be considered but cannot be used as a basis upon which to deny parole unless accompanied by facts showing that an inmate "*continues* to pose an unreasonable risk to public safety." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1221.)

*the time of the commitment offense* a factor tending to show suitability. The legislative directive to accord "great weight" to the "diminished culpability of youth as compared to that of adults" makes clear, as did the United States Supreme Court in *Miller*, *Graham*, and *Roper*, that the imposition of more lenient punishment on youth offenders than on adult offenders serves the proportionality principle inherent in the cruel and/or unusual punishment provisions of the state and federal Constitutions. The circumstances of Palmer's life offense exemplify the " 'hallmark features' " of youth—" 'immaturity, impetuosity, and failure to appreciate risks and consequences' " (*Franklin, supra,* 63 Cal.4th at p. 283, quoting *Miller, supra,* 567 U.S. at p. 477)—that diminish youth offenders' culpability. As a 17-year-old high school dropout, Palmer made an impulsive "spur of the moment" decision to turn an attempted robbery with an unloaded gun into a kidnapping for robbery, during the course of which Palmer was shot by the victim. That Palmer had no idea of the consequences of his conduct is demonstrated by his question to the police officer who waited with him at the emergency room: "What will I get for doing this, six months or a year in custody?"

Palmer does not, as the Board says, interpret the youth offender statutes "as requiring the Board to categorically find any juvenile offender suitable for parole simply based on his age when he committed the life crime." His position, with which we agree, is that the statutes represent a legislative determination that life prisoners who committed their controlling offense while under the age of 26 are less culpable than those who committed the same offense after reaching age 26—absent "substantial evidence of countervailing considerations" (*Martin, supra,* 42 Cal.3d at p. 448)—should therefore be punished less harshly than otherwise comparable adult offenders.

In addition to its discussion of the concept of "great weight," Martin held that the trial court "should state on the record its reasons for finding that a sentence is or is not disparate" and "if it finds disparity but nevertheless declines to reduce the sentence to a nondisparate term, it should explain the reasons which justify a disparate sentence." (*Martin, supra,* 42 Cal.3d at p. 450.) Reaffirming the thesis of *In re Podesto* (1976) 15 Cal.3d 921, the *Martin* court explained that "a requirement of articulated reasons to

22

support a given decision serves a number of interests: it is frequently essential to meaningful review; it acts as an inherent guard against careless decisions, insuring the judge himself [or a Board panel] analyzes the problem and recognizes the grounds for his decision; and it aids in preserving public confidence in the decision-making process by helping to persuade the parties and the public that the decision-making is careful, reasoned and equitable." (*Martin,* at pp. 449-450, citing *In re Podesto*, at p. 937.)

A statement of reasons is no less important here. Indeed, if the Board is not required to satisfactorily explain why a youth offender is not entitled to a finding of suitability for release despite the presence of the statutory youth offender factors to which the Board is required to give "great weight," the statutory directive will all too easily become meaningless.

### *The Board Failed to Accord "Great Weight" to the Youth Offender Factors*

Although the youth offender statutes, which became effective almost five years ago, directed the Board to adopt new regulations regarding determinations of suitability for youth offenders (§ 3051, subd. (e)), such regulations have not yet been added to title 15 of the California Code of Regulations. Proposed regulations were submitted to the Board at its November 2016 executive board meeting, however, which provide a useful framework for consideration of the Board's decision in the present case.[10]

Proposed regulations section 2444 addresses the content of the youth offender factors. Subdivision (a) states that "[t]he diminished culpability of youths as compared to adults includes, but is not limited to, consideration of the following factors: [¶] (1) The ongoing development in a youth's psychology and brain function; [¶] (2) The impact of a youth's negative, abusive, or neglectful environment or circumstances; [¶] (3) A youth's limited control over his or her own environment; [¶] (4) The limited capacity of youths to extricate themselves from dysfunctional or crime-producing environments; [¶] (5) A

---

[10] The proposed regulations would add article 14, entitled "Parole Consideration Hearings for Youth Offenders," to title 15 of the Code of California Regulations, and contain sections 2440 through 2446. (The proposed regulations are public records and available at <http://www.cdcr.ca.gov/BOPH/reg_revisions.html> [as of Sept. 13, 2018].)

youth's diminished susceptibility to deterrence; and [¶] (6) The disadvantages to youths in criminal proceedings."

Subdivision (b) of proposed regulations section 2444 states that "[t]he hallmark features of youth include but are not limited to, consideration of the following factors: [¶] (1) Immaturity; [¶] (2) An underdeveloped sense of responsibility; (3) Impulsivity or impetuosity; (4) Increased vulnerability or susceptibility to negative influences and outside pressures, particularly from family members or peers; [¶] (5) Recklessness or heedless risk-taking; [¶] (6) Limited ability to assess or appreciate the risks and consequences of behavior; (7) Transient characteristics and heightened capacity for change."

Subdivision (c) of proposed regulations section 2444 states that "[t]he subsequent growth and increased maturity of the inmate while incarcerated includes, but is not limited to consideration of the following six factors: [¶] (1) Considered reflection; [¶] (2) Maturity of judgment including, but not limited to, improved impulse control, the development of pro-social relationships, or independence from negative influences; [¶] (3) Self-recognition of human worth and potential; [¶] (4) Remorse; [¶] (5) Positive institutional conduct; and [¶] (6) Other evidence of rehabilitation."

Section 2445 of the proposed regulations states that "[w]hen preparing a risk assessment under this section for a youth offender, the psychologist shall also take into consideration the youth factors described in section 2444 and their mitigating effects" and that "[t]he psychologist's consideration of these factors shall be documented within the risk assessment under a unique heading from the remainder of the report."

Section 2446, subdivision (b) of the proposed regulation states that "[i]n considering a youth offender's suitability for parole, the hearing panel shall give great weight to the youth offender factors described in section 2444: (1) the diminished culpability of youths as compared to adults; (2) the hallmark features of youth; and (3) any subsequent growth and increased maturity of the inmate."

Subdivision (d) of section 2446 of the proposed regulations states that "[a] hearing panel shall find a youth offender suitable for parole unless the panel determines, even

24

after giving great weight to the youth offender factors, that the youth offender remains an unreasonable risk to public safety." Nothing in the proposed regulations requires that if the Board denies parole to a youth offender it must expressly find substantial evidence of countervailing considerations indicating unsuitability.

The portion of Dr. Geca's comprehensive risk assessment that addresses Palmer's status as a youth offender consists of two paragraphs. The first acknowledges that Palmer "grew up in an unstable home where there were no consistent and sufficient consequences for his troubling behaviors. Thus, he had no clear teaching or motivation for tapering his impetuous behavior and an 'addiction to instant gratification' seemed to define his trajectory of life. He lacked solid role models of how to delay gratification and he was at a disadvantage of having skills to effectively manage his frustration, impatience and his internal aggressive impulses. Moreover, he was a very insecure teen and he longed for acceptance. He believed that he was 'the cool guy' but in reality, he was pained inside and lacked skills to resolve his inner doubts about himself and about his abilities." Turning to Palmer's behavior while in prison, Dr. Geca states that Palmer "began to change" but his "struggle with impulsivity" still "plagues him and he is yet to demonstrate effectively consistent solutions to this problem. Although he has improved in recent years and has taken a progressively greater responsibility for his actions, he still relies on minimization and trivialization as his main defenses." Nonetheless, Dr. Geca noted, Palmer "has acknowledged his selfish outlook on life and has made strides to remedy this by providing assistance to other inmates . . . and to his fiancé and her father." "He began taking a more candid look at his antisocial and criminal attitudes and behaviors but the depth of his exploration has only developed in _the most recent months_. Consequently, his progression of age has only modestly mitigated his risk thus far and a more concerted and consistent effort is needed on his part to solidify his positive changes."

Dr. Good's psychological evaluation of Palmer was not a comprehensive risk assessment and therefore had no portion expressly devoted to the youth offender factors, but it did address Palmer's growth and maturity. Dr. Good supplied five reasons for his

25

conclusion that "Palmer has grown and matured during his 27 years of incarceration": "First, he converted to Islam at 22 years of age, about five years after imprisonment. The major impetus for his conversion was to atone for breaking the law, and to find a spiritual center he had been missing. He seems now to have a personal relationship with God: 'Christianity never required a surrender to something greater than myself. Islam has helped me become accountable with myself.' He sees the value of fasting (to deprive himself), the value of charity (giving to others) and is praying five times per day (to see where he went wrong and to correct himself). Involvement with Islam was also a response to his loneliness, and the need to belong to a group of men dedicated to ideals beyond themselves or their own egos. A religious orientation tends to enhance self-control and represents personal development.

"Second, at no time during his 27 years of incarceration did Mr. Palmer join a prison gang. He believes he is choosing friends more wisely now, and not long ago requested a change in housing unit to distance himself from negative peers. His relationship with Newbill is another example of his good judgment in people. She was very critical of him for the institutional rule violation in May 2014, and encouraged him to be honest with authorities about his mistake and to learn from it, despite the potential consequences. He debated what to do, overcame some defensiveness and ultimately agreed with her, that it was important to confess his mistake and take the high road. This is the kind of maturity that will guide him successfully in the future.

"Third, Mr. Palmer had engaged in only one physical altercation while in prison, an incident with his [cellmate] in 1990. When he did violate the rules, none were violent. Were he as impulsive as he was as a teenager, we would expect more conflict and potential violence over the years. The absence of any significant violence during his imprisonment is a sign of growth and positive prognosis.

"Fourth, his educational programming in prison led to an Associate's Degree in Science and Business from Palo Verde College in 2008. He had little literacy when he finished high school and since his incarceration he has educated himself and become a more worldly person. His 12 step work, anger management and MANUP programs have

26

helped him to build new psychological skills. Being able to cope with adversity and to be resilient are critical for responding with maturity in the face of difficult challenges."

Dr. Good felt that Palmer's recent rules violations were "modest transgressions" and agreed with Dr. Geca's statement that "[h]is missteps are not major and they do not warrant a significant elevation of his risk." In Dr. Good's opinion, "Palmer constitutes a low risk for future violence at the present time."

Rejecting Dr. Good's opinion, the Board acknowledged that Palmer satisfied all of the factors included in the proposed regulations as relating to "the diminished culpability of youth as compared to that of adults" and as "the hallmark features of youth," as well as that he is "at an age that would reduce the probability of recidivism" and has "realistic plans for release," and that his continuous participation in programs demonstrated "a lengthy period of positive rehabilitation." The panel nevertheless concluded Palmer still presented "an unreasonable risk of danger to society" primarily because of his history of past rule violations,[11] particularly the most recent two: using a cell phone in 2012 to talk to his sister upon learning of their mother's death, and, at a visit in 2014, giving his girlfriend the T-shirt he used while painting.

As noted, under the Board's proposed regulations, the panel "*shall* find a youth offender suitable for parole *unless* the panel determines, even after giving great weight to the youth offender factors, that the youth offender remains an unreasonable risk to public safety." (Proposed Regs., § 2446, subd. (d), italics added.) In effect, the regulation creates a presumption of suitability based on an objective factor—the diminished culpability of an offender less than 26 years of age—that may be rebutted by a subjective determination that the youthful offender remains dangerous. This interpretation of the

---

[11] Only one of the past violations, fighting with a cellmate, was violent. While the commissioner referred to a " '94 cell fight," Dr. Geca and Dr. Good both indicated the incident was in 1990. The other violations shown by the record were for possession of "excessive art supplies," "manipulation," possession of a phone charger, possession of an expired credit card, violating "grooming standards," "failure to report," and "sending a personal ad to be published in the Sacramento Bee using a return address that didn't indicate that you're a prisoner."

27

regulation is consistent with our understanding, informed by *Martin, supra,* 42 Cal.3d 437, that in giving "great weight" to the youth offender factors, the Board will find a youth offender suitable for release unless there is *substantial evidence,* not merely *some evidence*, of countervailing considerations indicating the offender is unsuitable for release.

Having acknowledged that all of the factors enumerated in its proposed regulations as reflecting "the diminished culpability of youths as compared to adults" and the "hallmark features of youth," are present in this case, as well as five of the six regulatory factors indicative of "subsequent growth and increased maturity," the Board's decision to deny parole appears to rest on the single factor it viewed as *not* present: "*Maturity of judgment including, but not limited to, improved impulse control*, the development of pro-social relationships, or independence from negative influences. (Proposed Regs., § 2444, subd. (c)(2), italics added.) Indeed, the Board relied only upon the italicized portion of this one factor.

The Board thus denied Palmer release, and subjected him to five more years of imprisonment, notwithstanding the presence of almost all of the 19 factors identified by the Board to flesh out and give meaning to the statutory youth offender factors, primarily because three years earlier he improperly used a cell phone to contact his sister about the death of their mother, and a year earlier he gave his girlfriend as a gift the T-shirt he used when he painted. This determination hardly appears to reflect "substantial evidence of countervailing considerations" (*Martin, supra,* 42 Cal.3d at p. 448) justifying a denial of parole despite giving "great weight" to the juvenile offender factors. On the contrary, in the absence of any other explanation, the elevation of Palmer's two minor violations over all of his numerous other qualities seems to us arbitrary and capricious.

If the Board had reason to believe Palmer's failure to fully control his impulses outweighed his "considered reflection" on his past life choices, his "development of pro-social relationships" and "independence from negative impulses," his "remorse," his "positive institutional conduct," and "other evidence of rehabilitation," it has never explained why it believes this to be the case, much less pointed to substantial supporting

28

evidence.  As we have said, our previous review led us to observe that it was "hard to discern" any nexus between Palmer's recent rules violation and "present dangerousness"; the evidence was sufficient to satisfy the "ultralenient" standard, we said, "but barely.  It is an extremely close case."  That observation was made without regard to the Board's consideration of the youth offender factors.  Considering the Board's statutory obligation to give "great weight" to those factors, its decision to find Palmer unsuitable for release despite the presence of almost all the variables the Board itself has deemed indicative of the statutory youth offender factors cannot stand.

## DISPOSITION

For the foregoing reasons, the petition is granted, the decision of the Board denying Palmer parole is vacated, and the Board is again ordered to hold a new hearing as soon as practicable, and in no event later than 120 days of the filing of this opinion, and to decide whether Palmer is suitable for release on parole in a manner that comports with this opinion.

_____
Kline, P.J.

I concur:


_____
Stewart, J.

*In re Palmer, on Habeas Corpus* (A147177)

30

In re Palmer on Habeas Corpus A147177

Concurring Opinion of Richman, J.

I concur with Presiding Justice Kline's opinion.

I write separately to express my deep concern that in their zeal to take issue with our earlier opinion (*In re Palmer* (July 26, 2017, A147177) (*Palmer I*).)—which, of course, was their right, and indeed was successful—the Board and its counsel, the Attorney General, have shown utter disregard for the rights of Palmer. This is especially troubling as the issue involved in *Palmer I* with which the Board disagreed, the obligation to set base terms, was not unique to Palmer but a generic issue applicable to all prisoners.

As indicated in Presiding Justice Kline's opinion, in *Palmer I* we found "some evidence," "but barely," and we ordered the Board to hold a new hearing in no later than 120 days. Doing so, we ended the opinion with these two paragraphs:

"Thus, we are left with Dr. Geca's report and Palmer's own description of his state up to May 7, 2014 as the evidence supporting the Board's denial of parole. Applying the ultralenient standard as we must, we would conclude that it is some evidence—but barely. It is an extremely close case.

"Palmer's next parole hearing will be sometime in late 2017, some two and one-half years—and not incidentally, with a full one-quarter of Palmer's base term having passed—since his last hearing. We would assume that if Palmer's prison record in those thirty months has been uneventful, the Board could not conclude that there is some evidence of current dangerousness. Put otherwise, if Palmer has kept his promise to the system and to himself, not even Dr. Geca could conclude Palmer is anything but a low risk for violence."

But Palmer's next parole hearing did not take place in "late 2017," or at all. Rather, as Justice Kline describes, what occurred is that "The Board set a hearing date of October 26, 2017, which it then postponed to November 17. On November 15, 2017, the California Supreme Court granted the Board's petition for review of our ruling, deferred further action on the matter pending consideration of a related issue in the Board's appeal

1

from our order denying its motion to modify the settlement and stipulated order in *Butler*. The court also denied as moot Palmer's motion to compel the Board to hold a parole hearing on October 26, 2017, and stayed our order requiring the Board to conduct a parole hearing for Palmer." (*Palmer I, supra,* A147177.) And Palmer's next hearing is currently scheduled for June 2020!

The information in the preceding paragraph was developed from letters from counsel responding to our letter sent in preparation for argument in this case, inquiring as to why "Palmer's court-ordered hearing on October 26, 2017 had been cancelled, and when his next parole hearing would be held," which responsive letters are quoted in the footnote. [1]  What can be gleaned from those letters is that Palmer's new hearing had been

---

[1] Deputy Attorney General Denise Yates responded as follows:

"On September 5, 2017, respondent petitioned for review of this court's decision, which required the Supreme Court to rule on the petition by November 6, 2017. The Board initially scheduled Palmer's parole hearing for October 26, 2017, but, considering the procedural posture, that hearing was rescheduled to November 17, 2017, to allow for the Supreme Court's ruling on respondent's petition for review. When the Supreme Court extended its ruling until December 4, 2017, respondent asked the Supreme Court to stay this court's underlying July 26, 2017 decision and, on November 15, the Supreme Court granted review and stayed Palmer's court-ordered hearing. Thus, the Board appropriately did not hold a court-ordered hearing for Palmer while the Supreme Court resolved relevant legal issues. Regarding the latter question, Palmer was denied parole on June 2, 2015 for five years. His next parole consideration hearing is due June 2, 2020."

Palmer's counsel Megan Havstad responded as follows:

"On October 24, 2017, Ms. Yates informed me that Mr. Palmer's October 26, 2017 hearing was being cancelled at her direction due to a scheduling miscommunication between her and the [Board]. She also expressed her view that there was no point in holding the court-ordered hearing before the California Supreme court decided the State's petition for review of this Court's July 26, 2017 order. She further stated that because the deadline for a decision from the California Supreme Court on her petition for review was November 4 or 6, she did not want the Board to hold Mr. Palmers' hearing before November 6. She stated that the October 26 hearing would be vacated regardless of any objection by Mr. Palmer. In a letter that I sent her later that day, I explained that a postponement was not proper and would be a violation of this Court's July 26, 2017 order and Mr. Palmer's rights. Although a hearing was later scheduled for November 17, 2017, the Board took the rescheduled November 17 hearing off-calendar after the California

set, a hearing no doubt all expected would likely result in a holding in his favor. Despite that, and despite that his release would not affect the Board's right to contest the generic issue we decided, the Deputy Attorney General, however gratuitously, caused the hearing to be cancelled—and Palmer to remain in prison. While this might not have been in violation of any court order, it certainly was unnecessary. And unmerciful.

So here we are in late 2018, and Palmer remains in prison, having been there now 30 years—three times his base term and two and one-half times his adjusted base term—for a crime that injured only him. And he remains against the background that in 2015 there was "barely" enough evidence to keep him there, and, as we were advised at oral argument, the further background that in late 2017, Dr. Geca had issued a new report concluding that Palmer was a "low risk"!

Here we again order that Palmer receive a new hearing on an expedited basis, this in an opinion that holds against the Board's vigorous opposition—yet again on a generic issue applicable to all prisoners, not just Palmer. And if the past is any indication, the Board will seek review. So I write, to implore the Attorney General that if he seeks review, he does not request that the Supreme Court stay Palmer's parole hearing—and that if any such request is made, the Supreme Court deny it.

---

Supreme Court stayed this court's July 26, 2017 order on November 15, 2017." At oral argument, Ms. Havstad represented that she had in fact appeared at the hearing on November 17, to be advised only then that the hearing was cancelled.

_____
Richman, J.

*In re Palmer, on Habeas Corpus* (A147177)

Counsel:

O'Melveny & Myers, Cara Gagliano, Megan L. Havstad, Geoffrey Yost for Petitioner.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Acting Attorney General, Jessica N. Blonien and Julie A. Malone, Acting Assistant Attorneys General, Phillip J. Lindsay, Senior Assistant Attorney General, Sara J. Romano and Denise A. Yates, Deputy Attorneys General for Respondent.